

NUMBER 13-13-00499-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF C.T., A/K/A B.B.T., A CHILD

### On appeal from the 377th District Court
### of Victoria County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Garza and Perkes
### Memorandum Opinion by Justice Garza

In this accelerated appeal, *see* TEX. R. APP. P. 28.4, appellant K.T. contends by five issues that the evidence was insufficient to support the trial court's judgment terminating her parental rights to C.T., a/k/a B.B.T., her biological son.[1]  We affirm.

## I. BACKGROUND

C.T. was born on August 16, 2012.  On September 5, 2012, appellee, the Texas

---

[1] To protect the privacy of the parties, we refer to the mother and child by their initials.  *See* TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2011); TEX. R. APP. P. 9.8(b)(2).

Department of Family and Protective Services (the "Department"), filed a petition seeking conservatorship of C.T. and termination of K.T.'s parental relationship.[2]  The petition noted that the name and whereabouts of C.T.'s biological father are unknown.

Joel Deborah of the Gulf Bend Center, a mental health treatment clinic in Victoria, Texas, testified that he is a licensed clinical social worker.  He interviewed K.T. on April 11, 2007, when K.T. was thirty-five years old, and he prepared a diagnostic report which was entered into evidence.  According to the report, K.T. stated that she has "racing thoughts, has crying spells, has difficulty maintaining focus and concentration, has trouble sleeping, is suspicious and paranoid and has manic tendencies."  K.T. stated that her mother died of lung cancer in 1987, when K.T. was fifteen years old.  K.T. reported that she was the victim of rape in 2004, which caused a painful back injury.  She also reported that her boyfriend died in a motorcycle accident in 1998 and that she used cocaine and ecstasy after that, but that she stopped using in 2000.  She said she was prescribed and has taken various antidepressant medications in the past, including Cymbalta, Wellbutrin, and Effexor.[3]  She was taking Xanax for eight years but stopped shortly before the interview.  Deborah diagnosed K.T with "bipolar [disorder], mixed, severe; posttraumatic stress disorder; cocaine abuse; and borderline personality disorder."  He recommended that K.T. seek counseling for substance abuse and sexual assault.

Melanie Aguilar, a nurse at DeTar North Women's and Children's Center in Victoria, testified that she cared for K.T. and C.T. for two days after the baby was delivered

---

[2] The petition did not specify what part or parts of family code subsection 161.001(1) K.T. allegedly violated.  *See* TEX. FAM. CODE ANN. § 161.001(1) (West Supp. 2011).  Instead, the petitions merely stated that K.T. "committed one or more of the following acts and omissions" and proceeded to recite the entirety of subsection 161.001(1).

[3] In an application questionnaire filed with the Gulf Bend Center, K.T. stated that she has seen various "shrinks" and "counselors" since 1998.

by Caesarean section. Aguilar stated that K.T. "was going for smoke breaks quite often" and frequently complained about "pain control." In Aguilar's opinion, K.T. required more than a normal amount of pain medication. Aguilar observed that the pain medication did not seem to reduce K.T.'s pain. She stated that she had concerns about K.T.'s ability to care for the baby. She elaborated: "I do remember one quote she presented to me was that she had come—She was number one; in order for the baby to be taken care of, which would be second." Aguilar agreed with the Department's counsel that she was concerned that K.T. was "enhancing her feeling of pain to get medication."

On cross-examination, Aguilar recalled that one of K.T.'s "smoke breaks" was "about an hour" long. During Aguilar's initial 12-hour shift, K.T. took "about three" smoke breaks "but they were pretty long." When asked if there were any other reasons to be concerned about K.T.'s ability to care for C.T., Aguilar replied: "There was minimal care from her. That was my concern. As I stepped into the room, it was always about her pain control and what she needed, never a concern that the baby needed anything or she needed anything about newborn care."[4] Aguilar stated that she changed C.T.'s diaper once; she assumed K.T. changed his diaper at other times. She acknowledged that, at some point, K.T.'s intravenous catheter in her hand had "blown"; that is, it was "no longer in the vein and it's putting fluid, or whatever, into the tissue, not into the vein."

Another nurse at DeTar North, Missy Jobe, testified that she spoke to K.T. when K.T. sought to tour the hospital some time prior to the baby being delivered. According to Jobe, K.T. was "anxious about having the baby" and demanded that the hospital use

---

[4] Aguilar later reiterated: "My concerns were the excessive pain medications, limited bonding with the baby while the baby was in the room—I just really, one on one—With me, it was always centered around her and not what was going on with the baby."

3

general anesthesia, which "is not a common thing for C-sections." K.T. "wanted to know if we would have a helicopter standing by, where we could fly her to another hospital." Jobe described what happened when K.T. arrived at the hospital on the day of her C-section:

> There is a process where we do our admissions assessment and all the procedures to start the admissions. [K.T.] was in a very agitated point and said, "You know what? I don't want to do this. We're going to cancel." We called her doctor and the doctor gave us a prescription, an order for Vistaril. She was upset. She wanted Xanax. She had a very colorful vocabulary. "I don't give an 'f' about the baby. This is about me." We got her calmed down and then she decided to go through the procedure.

Jobe attended the delivery. She stated that K.T.'s delivery required "an extra anesthesiologist and two extra nurses, just to hold and control her . . . . She was extremely agitated, not cooperative, and scared." After the delivery, C.T. was transferred to the neonatal intensive care unit because of respiratory depression. The child was returned to K.T. after one and a half or two days.

Jobe stated that, because of K.T.'s behavior, the neonatologist attending the delivery "didn't want the baby unattended." According to Jobe, hospital staff had concerns about the baby going home with K.T. because:

> She had a focus on herself, not the baby. She had an extremely agitated condition. She paced. She wouldn't stay in her room very long. She would go from being in pain and not able to move to leaving the room and smoking for long periods of time. No concerns about the baby. She had a focus on herself.

As a result of their concerns, the hospital staff "[d]id a social services consult." On cross-examination, Jobe denied knowing that K.T. developed an infection from the C-section. She denied being aware that K.T. had expressed concerns as to the "credentials" of the anesthesiologist. She acknowledged that, according to a report, a blood test performed

4

on K.T. on August 16, 2012 to screen for drugs returned all negative results.[5]

Sally Segura, a Department investigator, testified that she received a call to go to DeTar North on September 3, 2012. She "was told they were needing [her] assistance with a mother that had come in with [a] child and was attempting to leave, without having the child examined." By the time Segura arrived at the hospital, the mother—K.T.—agreed to let the child undergo an X-ray, which showed a possible skull fracture. K.T. told Segura that "she had put [C.T.] on the . . . back of the couch and a pillow. And she went to the kitchen, which was behind the couch, and she heard him cry and she said he had rolled off the couch." Hospital staff wanted to evacuate C.T. to Driscoll Children's Hospital in Corpus Christi, but K.T. refused to consent to the transfer. K.T. also refused to take a drug test at that time. Police then arrested K.T. The Department took custody of C.T. and gave consent for him to be transferred to Driscoll. Examinations at Driscoll revealed that C.T. did not, in fact, suffer a skull fracture or any other injury. According to Segura, because there was no injury, "[t]here was no reason to do the removal." Charges against K.T. were dropped and she was released from jail. However, C.T. remained in the Department's custody.

Rebecca Kerth took over the Department's investigation from Segura. Kerth testified that she spoke with K.T. at the Victoria County Jail on or about September 3, 2012. K.T. denied that she had any mental health issues or that she had ever been to Gulf Bend Center. After K.T. was released from jail, Kerth arranged for K.T. to have visitation with C.T. Kerth observed one visitation. She observed K.T. place C.T. on a "vinyl love seat" with "his feet . . . faced towards the end and off the couch" while she

---

[5] The trial court subsequently took judicial notice that Xanax is one of the drugs that was screened for.

"turn[ed] to get things out of the diaper bag." Kerth opined that this put C.T. in a position where he might fall off the couch. Kerth also observed that K.T. attempted to give C.T. gas drops as soon as she arrived at the visit, rather than after feeding as per the medication instructions.

Kerth testified that the removal of C.T. from K.T.'s custody was based on other incidents in addition to the one that occurred on September 3, 2012. In particular, Kerth stated that an anonymous call was made to the Department's hotline on August 20, 2012, and that "[t]he concern at the time was that [K.T.] was allegedly found to have a high level of Xanax in her system." Another anonymous call was made to the hotline on September 1, 2012 alleging that K.T. "was using drugs and refused to buy necessities for her child and she suffered from undetermined mental illness and substance abuse that the person was concerned about."

Department case worker Jasmine Stiff replaced Kerth in October 2012. Stiff stated that, although K.T. has gone to Reclamation Counseling Center ("Reclamation") in Victoria, K.T. did not say that she went there for counseling and Stiff received no counseling reports concerning K.T. from Reclamation. Stiff testified that K.T. was told to take parenting classes at Reclamation but has not done so. K.T. informed Stiff that she did not have any mental health issues and did not need mental health counseling. K.T. did not execute release forms allowing the Department to view her medical records. According to Stiff, K.T. twice submitted to random drug tests but was unable to complete the tests because her mouth was too dry. On another occasion, K.T. came to Texas Health Center for a hair follicle drug test but "became very agitated with the staff" and refused to undergo the test. Stiff stated that K.T. has left "rambling" telephone messages.

6

K.T. has also verbally threatened Department staff members, causing the Department to file a criminal trespass complaint against K.T. on July 3, 2013.[6] Since that time, K.T. has neither visited with C.T. nor requested, by herself or through her attorney, to arrange visits. Stiff also stated that K.T. has failed to keep a stable residence and has failed to inform the Department of the location of her residence. Finally, Stiff stated that, since she took over the case, K.T. was twice arrested for public intoxication: once on December 18, 2012, and once on April 16, 2013.

Stiff stated that the Department was concerned about the manner in which K.T. would visit with C.T. because:

> [K.T.] would become agitated very easily, irritated, distracted. She would talk very loud, be very concerned about other things, as opposed to visiting with her son for the one hour she had, bonding with him. The way she changed his diaper, trying to give him medicine he did not need at this time. Her questioning the type of food he was eating, the bottles that were prepared for him . . . . She would start changing him and then go to retrieve different things to change him, leaving him unattended or putting him in a very unsafe position while she attempted to get the items needed to change his diaper. . . . He almost fell off the couch. And, on several times [sic], he has almost fallen off the love seat in our visitation room. . . .

According to Stiff, K.T. "has been seen throwing [a] dirty diaper across the room, as well as a wipe." Stiff testified that, on at least three occasions, K.T. called 911 from the visitation room complaining of markings on C.T.'s body that she believed to be bruises or other injuries. Each time, the police came and could find no injuries on C.T. Stiff stated that K.T. has contacted the FBI and the Texas Rangers in order to complain about the Department. Stiff agreed with the Department's attorney that K.T. is a danger to C.T

---

[6] According to Stiff, K.T. verbally threatened staff members by referring to the "Blackwell case," a 2006 incident where a Department supervisor was sexually assaulted and murdered. *See* Allan Turner, *Victoria Man Pleads Guilty to Killing CPS Worker*, HOUS. CHRON., Jan. 11, 2008, http://www.chron.com/ /article/Victoria-man-pleads-guilty-to-killing-CPS-worker-1768466.php (last visited Jan. 31, 2014). Stiff did not otherwise elaborate as to how K.T. committed criminal trespass.

7

"because of her refusals to get any sort of direction on anything."

When C.T.'s attorney ad litem asked Stiff whether C.T. is "in a safe place," Stiff replied "Yes." Stiff agreed that C.T.'s foster parents "have been very cooperative" with taking C.T. to the doctor every time the Department requested that they do so and that C.T. is in good health. She conceded that, when C.T. was about ten months old, he pulled on a dishwasher door which then hit him in the eye, causing a bruise.

On cross-examination, Stiff conceded that K.T. did not receive a copy of the trial court's order compelling her to comply with the service plan until February 2013, some five months after C.T. was removed. Stiff stated that it does not normally take that long for a parent to receive a service plan; however, the reason for the delay was that K.T. was being "uncooperative." Stiff admitted that C.T. has "suffered various injuries" while in foster care but was not concerned about that because: "Each time something has happened, I've been notified in writing, with a picture, and the doctor's information received from the nurses' hot line. I have been given that information and I have seen him consistently."

Christine Tovar, a case supervisor for Golden Crescent CASA, supervised visits between K.T. and C.T. on seven occasions. Tovar "observed difficulty with [K.T.'s] parenting skills with [C.T.], her ability to change his diaper, to understand his capabilities at different stages of his growth. . . . He has fallen. On other occasions, he was put at risk for falling." Tovar testified that K.T. verbally threatened her by leaving a telephone message stating "that these CASA ladies don't know who they are messing with, or things to that effect—that she knows ladies that would kill." Tovar stated that K.T. is a danger to C.T. and that C.T. is currently "doing good" and is not under any threat of harm. She

8

stated that "[i]t seems that" the foster parents would be interested in adopting C.T. should K.T.'s parental rights be terminated.

Michelle P. Moran, Ph.D., a psychologist, interviewed K.T. on February 11, 2013. Dr. Moran stated that K.T. was "[n]ot fully" cooperative with her and refused to undergo certain tests, including a cognitive test and an IQ test, because "[s]he felt that she was sufficiently educated and those were not necessary for her." K.T. refused to answer questions regarding her "relationship history" in any detail. According to Dr. Moran, K.T. indicated that she knew the identity of C.T.'s father but did not want to disclose that. K.T. did not acknowledge that she had previously been diagnosed with bipolar disorder or that she had been the victim of a sexual assault. The results of the tests that K.T. did submit to showed "serious impairment" in "general functioning." Dr. Moran concluded that K.T.'s "mental status was impaired," that she "needed improvement [in] decision making and self-control," and that she needed to be in regular therapy. Dr. Moran also recommended that K.T. take parenting classes.

Sammy Holder, Reclamation's business administrator, testified that when K.T. visited his office for treatment, she demanded to see proof of the qualifications of the counseling personnel. Holder offered to allow K.T. to make appointments with each individual counselor so that she could view their credentials, but K.T. refused to make any appointments. She never participated in therapy at Reclamation. On cross-examination, Holder acknowledged that one of the therapists at Reclamation had signed a document indicating that "[K.T.] was in the office on 5-22-13, to make an appointment, at 4:45 p.m."

After the Department rested, K.T. testified on her own behalf. She stated that, on the one occasion that C.T.'s attorney ad litem supervised a visit, the ad litem was "pleased

9

with the interaction." K.T. felt like she was being "railroaded" because of the September 3, 2012 incident when C.T. fell off the couch. She reiterated that C.T. was found to have no injuries arising out of that incident. She stated: "I'm not some mental case that they feel so inclined to make me out to be." She stated that she was concerned that C.T. "started showing up to the visitation with different injuries, not every single week, but between April and June" of 2013. K.T. identified several pictures of alleged injuries to C.T., including scratches on his hand and face, an eye contusion, and "horrendous diaper rash." K.T. stated that, when Department staff "blew . . . off" her complaints regarding C.T.'s apparent injuries, she called police to report the injuries. K.T. identified pictures of various items she had purchased to care for C.T., including clothes and food. She claimed she was "100 percent sure" she would take better care of C.T. than the Department had.

K.T. acknowledged on cross-examination that both North and South branches of DeTar hospital made criminal trespass complaints against her. She claimed that was because she was trying to get records of her "C-section infection." K.T. further conceded that, on or about December 21, 2012, her father "took out a criminal trespass warning" preventing her from visiting his home. She did not recall receiving an order compelling her to execute release forms allowing the Department to view her medical records. She denied ever being treated for bipolar disorder.[7] When asked what medications she was currently taking, K.T. replied: "I don't feel comfortable answering that." When asked whether she completed a parenting class, K.T. replied: "I've been to Reclamation three

---

[7] K.T. stated that she went to Gulf Bend Center to "fill[] out an application" but that she was never a patient there.

times . . . . I have a college degree. You don't need a college degree to raise a child."

K.T. initially denied knowing the identity of C.T.'s father, but later stated: "I'm not disclosing that information, in regards to [C.T.]'s father . . . ." She denied that C.T. was the product of artificial insemination. She stated that she did not recall any details of the conception. When the attorney ad litem asked whether K.T. thought it was important for a child to know who his parents are, K.T. replied: "It depends on the child . . . . Not necessarily." She stated that she would have enough resources to care for C.T. because she receives monthly Social Security disability checks.

The trial court rendered judgment terminating K.T.'s parental rights.[8] In its judgment, the trial court found by clear and convincing that K.T. had violated parts (E)[9] and (O) of family code subsection 161.001(1) and that termination of K.T.'s parental rights was in the child's best interests. *See* TEX. FAM. CODE ANN. § 161.001(1)(E), (1)(O), (2) (West Supp. 2011). The trial court further found by clear and convincing evidence that K.T. "has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child" under family code subsection 161.003. *See id.* § 161.003.[10] This appeal followed.

---

[8] The judgment also terminated the parental rights of C.T.'s unknown father, who is not a party to this appeal.

[9] Under part (E), termination of the parental relationship may be ordered if the court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(E).

[10] Family code subsection 161.003 provides that the trial court may order termination if:

(1)   the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child;

(2)   the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child;

## II. Discussion

### A.     Standard of Review and Applicable Law

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi 2010, no pet.). Termination must be supported by clear and convincing evidence. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re L.J.N.*, 329 S.W.3d at 671. This intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008); *see In re L.J.N.*, 329 S.W.3d at 671.

Before terminating parental rights, the trier of fact must find: (1) that the parent committed an act prohibited by subsection 161.001(1) of the Texas Family Code; and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. §§ 153.002, 161.001 (West Supp. 2011); *see In re J.L.*, 163 S.W.3d at 84.

---

(3)   the department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination . . . ;

(4)   the department has made reasonable efforts to return the child to the parent; and

(5)   the termination is in the best interest of the child.

*Id.* § 161.003(a). The trial court's judgment contained findings tracking all five parts of this statute.

In reviewing the legal sufficiency of the evidence supporting termination, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d at 85; *In re L.J.N.*, 329 S.W.3d at 671. We must assume that the fact finder resolved disputed facts in favor of its finding if it was reasonable to do so and must disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible. *In re L.J.N.*, 329 S.W.3d at 671. We must also consider undisputed evidence, if any, that does not support the finding. *In re J.L.*, 163 S.W.3d at 86.

When reviewing the factual sufficiency of the evidence supporting a termination order, we determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re C.H.*, 89 S.W.3d at 25. In conducting this review, we consider whether the disputed evidence is such that a reasonable finder of fact could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

## B.    Findings Under Family Code Subsection 161.001(1)

By her second issue, K.T. argues that there was insufficient evidence to support the finding that she violated part (O) of family code subsection 161.001(1).[11] Under that

---

[11] K.T.'s entire appellate argument as to this issue is as follows: "The court's record and the reporter's record is [sic] entirely void of any clear and convincing evidence that Appellant failed to comply with the provisions established by the [Department] necessary for Appellant to obtain the return of the child."

part of the statute, termination of the parental relationship may be ordered if the court finds by clear and convincing evidence that the parent

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child . . . .

TEX. FAM. CODE ANN. § 161.001(1)(O).

The record reflects that the trial court rendered an order on February 1, 2013, approving the Department's service plan and adopting its terms "as if the same were copied verbatim" in the order.[12] The service plan required, in part, that K.T "participate in and complete a parenting course" and "refrain from any criminal activity." K.T. did not complete a parenting course; and she was arrested for public intoxication, a class C misdemeanor, *see* TEX. PENAL CODE ANN. § 49.02 (West 2011), on April 16, 2013. The evidence was therefore legally and factually sufficient to support the trial court's finding under part (O) of the statute. We overrule K.T.'s second issue.[13]

---

[12] C.T. was removed from K.T.'s custody on September 3, 2012, and the termination hearing commenced on July 29, 2013. K.T. does not dispute that, at the time of the termination hearing, C.T. had "been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child . . . ." TEX. FAM. CODE ANN. § 161.001(1)(O).

[13] Because of our disposition of this issue, we need not address: K.T.'s first issue, in which she challenges the sufficiency of the evidence supporting the trial court's finding that she "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id.* § 161.001(1)(E); her third issue, in which she challenges the sufficiency of the evidence supporting the finding that she "has a mental or emotional illness or a mental deficiency that renders [her] unable to provide for the physical, emotional, and mental needs of the child," *id.* § 161.003(a)(1); or her fourth issue, in which she challenges the sufficiency of the evidence supporting the finding that her "illness or deficiency . . . will continue to render [her] unable to provide for the child's needs until the 18th birthday of the child." *See id.* § 161.003(a)(2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest."); *see also* TEX. R. APP. P. 47.1. We note that the bulk of the argument section in K.T.'s appellate brief is devoted to these three issues.

**C.    Best Interest of the Child**

By her fifth issue, K.T. argues that the evidence was insufficient to support the finding that termination of her parental rights is in C.T.'s best interest.[14]   The following non-exhaustive list of factors is considered in determining whether parental termination is in the child's best interest:  (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent.  *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).  The party seeking parental termination is not required to prove all nine factors.  *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).  In some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child.  *Id.* at 27.

---

[14] K.T.'s entire appellate argument as to this issue is as follows:

> The testimony and evidence presented for termination to the trial court in the above case was legally and factually insufficient to support the court's finding that termination of K.T.'s parental rights was in the child's best interest.  The record is void of evidence that termination of [K.T.]'s parental rights would be in the best interest of the child.  The State did not offer any evidence of why the termination of [K.T.]'s rights would be in the best interest of the child.

For its part, the Department's entire appellate argument as to this issue consists of a recitation of the *Holley* factors and the following two sentences of analysis:

> In this case K. T. cannot meet the needs of her infant son without treatment and refuses treatment.  While the mother has not threatened the child she has threatened other people surrounding this case and has placed the child in circumstances where he could be injured even after the first time the child was removed.

Because C.T. is too young to express a preference, consideration of the first *Holley* factor—the desires of the child—weighs neither in favor nor against termination. Moreover, C.T. has no special needs beyond the substantial emotional and physical needs possessed by any infant. Therefore, consideration of the second *Holley* factor also weighs neither in favor of nor against termination.

Consideration of the remaining *Holley* factors, however, weighs in favor of termination. With respect to the third factor—emotional and physical danger to the child—Deborah testified that he diagnosed K.T. with bipolar disorder, posttraumatic stress disorder, cocaine abuse, and borderline personality disorder, but K.T. testified that she does not believe she has any mental problems and that she has never been treated for bipolar disorder. She refused to state what medications she was currently taking. These facts indicate that K.T. may present a danger to C.T. by virtue of her untreated mental health issues.

Evidence further established that, while in K.T.'s care, C.T. fell off a couch, necessitating a trip to the hospital. Tests later confirmed that C.T. suffered no skull fracture as a result of the fall; however, Kerth and Stiff testified that, during supervised visitation with C.T., K.T. placed the child in an unsafe position, thereby putting him at risk of falling again. There was evidence that C.T. suffered scratches and a severe diaper rash while in the Department's custody, but Stiff stated that the foster parents had given C.T. proper medical treatment and she was not concerned about those injuries. This evidence is also relevant as to possible physical danger to C.T.

With respect to the fourth factor, concerning parenting abilities, K.T. testified that it was "[n]ot necessarily" important for a child to know the identity of both of his parents.

Aguilar testified that, after C.T. was born, K.T. stated that "[s]he was number one" and the baby "would be second." Aguilar observed "minimal care" offered by K.T. to C.T. Jobe testified that K.T. abruptly sought to cancel her planned C-section, stating "I don't give an 'f' about the baby. This is about me." Tovar, who observed K.T. visit with C.T. seven times, noted that K.T. had difficultly changing C.T.'s diaper and understanding his capabilities. K.T. did not complete the court-ordered parenting class, stating "[y]ou don't need a college degree to raise a child." This evidence strongly indicates that K.T. has poor parenting abilities and is unwilling to attempt to improve those abilities.

Stiff testified that K.T. has failed to keep a stable residence and has not informed the Department of her address. Stiff also stated that C.T. is in a "safe place" with his current foster placement, and Tovar stated that C.T. is "doing good" there. This evidence is relevant to the sixth and seventh *Holley* factors—i.e., plans for the child and stability of home or proposed placement.

With respect to the eighth *Holley* factor—any acts or omissions indicating an improper parent-child relationship—evidence established that K.T. has a history of inappropriate, erratic, and sometimes illegal behavior. Dr. Moran stated that K.T. did not fully cooperate with her and refused certain tests. K.T. was arrested for public intoxication in December 2012 and again in April 2013. She made verbal threats against Department staff members. Criminal trespass complaints were made against her by the Department, both branches of DeTar Hospital, and her father. At one visitation with C.T., K.T. threw a dirty diaper across the room. She repeatedly called 911 to report various injuries she observed on C.T., but police found no injuries.

The trial court had the opportunity to observe K.T.'s erratic behavior first-hand. At

17

the termination hearing, K.T. frequently interrupted witnesses and attorneys despite the trial court's repeated admonishments. At one point, K.T. accused the Department's counsel and the attorney ad litem of being "f**king psycho."

As to the ninth *Holley* factor—any excuses for the parent's acts and omissions—we note that K.T.'s behavior in complaining to the FBI and Texas Rangers about the Department may possibly be excused if she honestly believed that C.T. was being harmed while in the Department's custody. Moreover, her actions in demanding excessive pain medication while in the hospital may possibly be excused by the fact that, at one point, her intravenous catheter had become dislodged. However, there was no evidence of any legitimate excuse for her other behavior.

In light of the foregoing, we conclude that the evidence adduced at trial was legally and factually sufficient for the trial court to have formed a "firm belief or conviction" that termination of K.T.'s parental rights was in C.T.'s best interest. *See In re C.H.*, 89 S.W.3d at 25. K.T.'s fifth issue is overruled.

### III. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS GARZA,
Justice

Delivered and filed the
20th day of February, 2014.

18